# EXHIBIT A

Case 1:25-cv-08635-LAK    Document 2-1    Filed 10/20/25    Page 2 of 28

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**COMMERCIAL DIVISION**

| | |
|---|---|
| ALEXIS SCHOTTENSTEIN**,** on behalf of herself and all others similarly situated,<br><br>                      *Plaintiff,*<br><br>     - v. -<br><br>WAKEFERN FOOD CORP.**,**<br><br>                      *Defendant.* | **INDEX NO.**<br><br>Date Purchased: Sept. 16, 2025<br><br>**<u>SUMMONS</u>**<br><br>The basis of venue is CPLR § 503.<br><br>Plaintiff designates New York County as the place of trial, the basis of the venue is the residency of parties. |

TO THE ABOVE-NAMED DEFENDANT:

      **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorneys within 20 days after the service of this summons, exclusive of the day of service, or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York; and in case of your failure to appear to answer, judgment will be taken against you by default for the relief demanded in the complaint.

DATED: Sept. 16, 2025               Respectfully Submitted,

                                      */s/ Blake Hunter Yagman*
                                      Blake Hunter Yagman
                                      **SPIRO HARRISON & NELSON LLC**
                                      40 Exchange Place, Suite 1100
                                      New York, New York 10005
                                      Tel.:   202-557-1221
                                      Email: *byagman@shnlegal.com*

Case 1:25-cv-08635-LAK    Document 2-1    Filed 10/20/25    Page 3 of 28

*Attorneys for Plaintiff Schottenstein*
*and the Proposed Classes*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**COMMERCIAL DIVISION**

| | |
|---|---|
| ALEXIS SCHOTTENSTEIN, on behalf of herself and all others similarly situated, <br><br><div align="right">*Plaintiff,*</div><br> - V. - <br><br> WAKEFERN FOOD CORP., <br><br><div align="right">*Defendant.*</div> | **INDEX NO.** <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Alexis Schottenstein ("Plaintiff"), on behalf of herself and all others similarly situated, upon personal knowledge, information and belief, and the investigation of her counsel, alleges the following Class Action Complaint (the "Action" or "Complaint") against the above-captioned defendant, Wakefern Food Corp. ("Fairway"), and unnamed co-conspirator FaceFirst, Inc. ("FaceFirst"), seeking actual damages, statutory damages, restitution, disgorgement of profit into a constructive trust, injunctive relief, a declaratory judgment, reasonable costs and attorneys' fees, as well as pre- and post-judgment interest, as follows:

<u>**NATURE OF THE ACTION**</u>

1.     Across the country, tens of millions of Americans shop at grocery and convenience stores each day to buy food, goods, and basic necessities.  Each time a customer enters a retail store, they bring with them an essential and fundamental right to privacy—one that they do not surrender at the entrance.  Biometric information, like facial recognition data, is highly sensitive because it can used for a host of different secured access points, and function similarly to a unique

genetic password – one that cannot be edited or erased. And yet, hundreds (if not thousands) of stores unlawfully collect facial recognition data from customers without adequate disclosure or their consent. This Action seeks to hold Wakefern accountable for violations of these privacy rights under statutes and common law.

2.     Defendant owns over 200 grocery stores across the country, including its Fairway Markets stores in New York City, and has confirmed that it employs FaceFirst technology in New York, California, and Connecticut. In an effort to reduce "shrinkage" from theft of retail products and cut costs on hiring and training for loss prevention, grocery stores have used FaceFirst's facial recognition software at a steep cost to customer privacy. According to Defendant's spokesperson, FaceFirst was adopted because "[r]etail theft and shoplifting [have] a high rate of repeat offense and drive[] up grocery store costs for all customers. …[FaceFirst] is helping to prevent more crime in store."

3.     When businesses collect facial recognition information, they have compliance obligations under state and common law to retain, and otherwise process this data, under the premise of adequate consent. FaceFirst is notably evasive in disclosing how its facial recognition data is used, and its clients — such as Wakefern — are equally opaque. According to a statement from Defendant in 2023 to a local Connecticut news station (WFSB):

> For years retailers have used video surveillance technology to reduce shoplifting and theft. Advances in that technology now allow us the ability to identify repeated offenders, from repeat shoplifters to organized retail theft rings – the people who come into the store with the intention to steal […] [o]ur customers should feel comfortable and confident that the technology is not being used for any other purpose.
>
> They should also know that all of the video footage collected is regularly erased [and] is not sold […] [t]he issue of retail crime is bigger than any one retail outlet and many other retailers are implementing video surveillance and facial recognition technology, and we encourage you to reach out to industry and tech experts on the

topic. We recommend contacting FaceFirst, our technology provider, for more information on how the technology works and is best utilized.

4. This statement raises more concerns than it answers.

5. *First,* identifying recidivist shoplifters requires facial recognition to be conducted on every individual entering a retail location. This technology cannot be performed in a vacuum, as it prompts all entrants to be scanned, and provides their personal identifying information (i.e. names and facial recognition data) for store security to determine who should be removed from the premises. Defendant's claim that its use of this technology is limited to identifying "repeated offenders" is a red herring — the system is simply not capable of operating in such a narrowly tailored manner.

6. *Next,* Defendant claims to "regularly" erase the collected video footage that forms the basis of which facial recognition data is extracted. While this misleading statement seems to reassure that all data collected is ultimately disposed of, this claim does not actually assert that it applies to the underlying biometric data itself. In reality, data is necessarily retained by retailers like Defendant to re-identify people who enter their stores.

7. *Further,* the company's statement that the video footage is not sold is misleading. Defendant does not go as far as to say that the facial recognition data extracted from such footage is not commodified, nor does it clarify what FaceFirst and other potential third-parties do with what is collected. While there would be little utility in marketing raw video footage, facial recognition software allows FaceFirst to enhance and train its proprietary artificial intelligence systems and create a more valuable product – activity that does not require an actual sale, but still allows FaceFirst to profit by using the data.

8. *Finally,* Defendant recommends that concerned consumers "reach out to industry and tech experts" – this is troubling, as it provides no practical way for the everyday consumer to

know that their facial recognition data was being used problematically, let alone whom to contact about it.

9.      Retail shoppers are the economic foundation of American grocery and convenience stores. As the source of the revenue that enables these businesses to operate, customers deserve to have their privacy rights respected.

10.      Against this backdrop, Plaintiff brings this lawsuit on behalf of herself, and all similarly situated customers of retail stores — including Defendant's Fairway Markets stores — against Defendant that unlawfully deploys FaceFirst's facial recognition technology. Plaintiff seeks actual damages, statutory damages, restitution, disgorgement of profit into a constructive trust, injunctive relief, a declaratory judgment, reasonable costs and attorneys' fees, as well as pre- and post-judgment interest under state and common law causes of action.

## JURISDICTION and VENUE

11.      *Personal Jurisdiction.*  This Court has personal jurisdiction over Defendant because Defendant maintains their four grocery stores within New York County in the State of New York. This Court further has personal jurisdiction over the Defendant because the events giving rise to this Action occurred within the State of New York.

12.      *Venue.* Venue is proper in this Court against Defendant because Defendant maintains its four grocery stores within New York County.

## PARTIES

### PLAINTIFF

***Plaintiff Alexis Schottenstein***

13.      Plaintiff is domiciled in New York City in Kings County, New York.

14. During the applicable statutory periods, Plaintiff entered into at least one New York City grocery store owned by Defendant, including a "Fairway Markets" location, that collected facial recognition data using FaceFirst's software.

15. After the collection of her facial recognition data, Plaintiff's privacy rights were intruded upon, she has suffered emotional distress and the value of her facial recognition data was diminished when Defendants shared and sold to third parties for profit—all without her knowledge or consent.

## DEFENDANT

### *Defendant Wakefern Food Corporation*

16. Defendant Wakefern Food Corporation is a corporation headquartered in Middlesex County, New Jersey.

17. Wakefern, with over 80,000 employees, is the largest retailer-owned cooperative in the United States. As of 2023, Wakefern comprises 48 different companies, which operate 365 grocery and convenience stores under the banners for Fairway Market, as well as ShopRite, Price Rite Marketplace, The Fresh Grocer, Dearborn Market, and Gourmet Garage.

## CO-CONSPIRATOR

### *Co-Conspirator FaceFirst, Inc.*

18. Defendant FaceFirst Inc. is a corporation headquartered in Orange County, California. FaceFirst is a software provider that offers facial recognition software powered by artificial intelligence and machine learning. FaceFirst's software is used by hundreds of retailers— including airports, casinos, and popular event spaces.

19. FaceFirst claims to be "the market leader in facial recognition software" for retailers, and as of July 2025, has generated tens of millions of dollars in revenue from its software sales.

20. In February 2025, FaceFirst was acquired by GateKeeper Systems, Inc. — a publicly traded California-based loss prevention technology provider with five global offices, and offers services in 58 different countries.

## FACTUAL ALLEGATIONS

### *The Unique Sensitivity of Facial Recognition Data*

21. New biometrics laws addressing the growing risks and proliferation of identifying people by their unique biological characteristics. More advanced biometric identification methods continue to be rapidly developed, such as brain signal identification, heart pattern recognition, and finger vein pattern tracking. As discussed at the N.Y.C. City Council's legislative hearing, "[t]echnology is rapidly changing, especially when it involves the identification of individuals." [1]

22. Two main classes of biometrics data can be collected from individuals: (i) behavioral characteristics and (ii) physiological characteristics. [2] Behavioral characteristics track the conduct and actions of an individual, which may include an individual's keystroke, signature, and voice recognition. [3] Physiological characteristics examine the size, shape, or composition of

---

[1] Center for Global Development, *Biometrics FAQs*, CGD, 2019, https://www.cgdev.org/page/biometrics-faqs (last visited August 14, 2025).

[2] Angelica Carrero, *Biometrics and Federal Databases: Could You Be in It?*, 51 J. MARSHALL L. REV. 589–592 (2018) (citing Margaret Rouse, Biometrics, www.searchsecurity.techtarget.com/definition/biometrics; *see* generally, "*What is Biometrics?*," IDEMIA, www.morpho.com/en/biometrics (referring to biometrics as all processes used to recognize, authenticate, and identify persons based on certain physical or behavioral characteristics. The characteristics are universal, unique, invariable, recordable, and measurable) (last visited August 14, 2025).

Case 1:25-cv-08635-LAK    Document 2-1    Filed 10/20/25    Page 10 of 28

the individual's face and body, including hand geometry and facial recognition.[4] "Biometric identification has expanded from describing basic physical attributes to now include fingerprint scans, iris scans, retinal scans, voice recognition," and DNA.[5]

23.    Biometric identifiers come in a variety of forms that are unique (and largely unchangeable) to each person. This sensitivity prompts a critical need to protect and secure biometric identifiers that may:

- Specifically link an individual to a data record;

- Create digital identities that can be used for fraudulent purposes;[6] and,

- Be compromised by their immutability and limitations to modification.

24.    Businesses like Fairway can use biometric data to identify consumers, and link it to information such as their methods of payment, and types of credit cards and debit cards they own. The result is a vast repository of information—purchasing history, consumer habits, medical services paid for, etc.—all tied to an individual's biometric identifiers.

25.    In 2023, the U.S. biometrics market and industry were valued at nearly $9.98 billion.

26.    Personally identifiable information ("PII") has intrinsic value; however, biometric data often carries significantly greater value than other forms of PII–such as an address or passport number–because it is generally immutable and cannot be changed once compromised. According to the Richmond Journal of Law and Technology (Volume XV, Issue 4):

---

[3] *See id.*

[4] *Id.*

[5] Center for Global Development, *Biometrics FAQs*, CGD, 2019, https://www.cgdev.org/page/biometrics-faqs (last visited August 14, 2025).

[6] https://www.miteksystems.com/blog/looking-ahead-7-reasons-why-biometric-security-is-important-for-digital-identity (last accessed August 14, 2025).

> PII is an exceptional resource that companies can use for internal purposes or to sell to other companies…. Due, in part to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII. The value of the data increases when combined to provide information, such as consumer preferences that are not discernable from the data points individually.

> As a result, companies are maintaining, sharing and selling dossiers of millions of consumer preferences… The potential for increased profits and cost savings serve as a substantial impetus for companies to ensure and cost savings serve as substantial impetus for companies to ensure that their actions do not compromise access to this valuable resource.

27. Companies operating in data driven environments use PII for a variety of purposes, such as targeting specific consumers or, as in this case, reducing costs associated with labor and security. Data breaches further illustrate the value of PII, when information is assigned a resale price on the dark web. In previous data breach litigation, the loss of value of PII has been calculable and compensable to an exact dollar amount per individual—logic equally applicable to the most valuable biometric type.

28. Recognizing the need to protect consumers and citizens, the Federal Trade Commission's ("FTC") Policy Statement on Biometric Information and Section 5 of the Federal Trade Commission Act provides:

> Even outside of fraud, uses of biometric information or biometric information technology can pose significant risks to consumers…. Moreover, without clear disclosures and meaningful choices for consumers about the use of biometric technologies, consumers have little way to avoid these risks or unintended consequences of these technologies.

29. It goes on to state that the "use of biometric information technology may be an unfair practice within the meaning of the FTC Act":

> As discussed […] the collection of biometric information can create a serious risk of harm to consumers. Such harms are not reasonably avoidable by consumers if

Case 1:25-cv-08635-LAK    Document 2-1    Filed 10/20/25    Page 12 of 28

the collection and use of such information is not clearly and conspicuously disclosed or if access to goods and services is conditioned on providing the information. For instance, if businesses automatically and surreptitiously collect consumers' biometric information as they enter or move through a store, the consumers have no ability to avoid the collect or use of that [valuable] information.

30.    In response to the growing use of invasive biometric technologies, state legislatures and city councils across the country have either enacted or are contemplating biometric privacy statutes. Many of these statutes impose high statutory penalties to safeguard critical privacy rights and deter unlawful data practices.

### *New York City's Biometrics Law*

31.    To protect the privacy rights of its millions of citizens, the New York City Council passed Local Law 3 (the "NYC Biometrics Law"), effective July 9, 2021. The law prohibits the sale, lease, trade, or sharing of biometric identifier information in exchange for anything of value, and otherwise profiting from its use:

> This bill addresses the increased collection and use of biometric identifier information, such as the use of facial recognition technology, by commercial establishments to track consumer activity. The bill prohibits the sale of biometric identifier information. It also requires certain commercial establishments, such as retailers, restaurants, and entertainment venues, to post signage notifying consumers if they collect biometric identifier information. The bill provides for a private right of action that allows for judgments of $500 for failing to post signage or negligently selling/sharing biometric information and $5,000 for the intentional or reckless sale of biometric information. The bill requires the Chief Privacy Officer to conduct outreach and education to affected commercial establishments.[7]

32.    It defines biometric identifiers as:

> A physiological or biological characteristic that is used by or on behalf of a commercial establishment, singly or in combination, to identify, or assist in identifying, an individual, including, but not limited to: (i) a retina or iris scan, (ii) a fingerprint or voiceprint, (iii) a scan of hand or face geometry, or any other identifying characteristic.

---

[7] The New York City Council - File #: Int 1170-2018 (nyc.gov), emphasis added.

33.     Fairway and other stores equipped with FaceFirst's facial recognition software sell groceries and consumer products, and therefore qualify as retail establishments under the NYC Biometrics Law. As such, they fall squarely within the category of commercial businesses that the law was designed to regulate with respect to the unlawful collection and use of facial recognition data.

### *Defendant Violates the Federal Trade Commission Act*

34.     Under Section 5 of the Federal Trade Commission Act, it is a deceptive and unfair practice when a party "[e]ngag[es] in surreptitious and unexpected collection or use of biometric information."

35.     In this instance, Defendants failed to adequately disclose its collection, retention, and use of facial recognition data in violation of this statute.  And because New York's General Business Law § 349 prohibits deceptive acts and practices, incorporates FTC standards, and applies to privacy rights, Defendants' failure to disclose their biometric data practices constitutes a violation of state law.

### *FaceFirst's Facial Recognition Software*

36.     FaceFirst touts three core benefits of using their facial recognition software – customer identification, face recognition, and reduction of in-store violence.  According to FaceFirst, it "delivers highly effective face matching systems for retailers, including grocery stores, pharmacies, and other specialty retail environments.  We design our patented retail security platform to be scalable, fast, and accurate […] FaceFirst combines artificial intelligence with human oversight to prevent in-store violence and theft, including organized retail crime."[8]

---

[8] https://www.facefirst.com/retail, (last accessed Aug. 14, 2025).

Case 1:25-cv-08635-LAK    Document 2-1    Filed 10/20/25    Page 14 of 28

37.    However, no consumer, including Plaintiff and Class members, had any reason to know that FaceFirst was collecting their biometric data, nor that facial recognition templates were developing and training FaceFirst's proprietary artificial intelligence.   Without the collection of biometric data from Plaintiff and Class members, FaceFirst would not only lose access to valuable information and associated profits, but also be unable to market its artificial intelligence system as effective and accurate.

38.    FaceFirst features the following facial recognition software abilities:



39.    Loss prevention employees at retail stores typically use FaceFirst's software via a mobile application (available on the Google Play Store), which appears on a smartphone device:

INDEX NO. 656002/2025
RECEIVED NYSCEF: 10/09/2025

40.    FaceFirst's facial recognition software team and its extensive group of experts possess advanced knowledge of the technology's unique applicability to the New York City retail environment.  Specifically, Edwin Coello, the head of FaceFirst's "public safety and data governance operations," is former commanding officer of the New York Police Department's ("NYPD") Facial Recognition Unit.  Coello led the development and implementation of NYPD's facial recognition program including its "system design, policy and procedures."[9] According to Coello, he "joined FaceFirst because [] they are the best in class and focused on appropriate use of face matching technology."

41.    The widespread adoption and use of FaceFirst not only acts as a way to drive revenue through the sales of their software products, but also works to make the artificial intelligence components of their software more adept.

42.    To date, FaceFirst is sold directly to customers by FaceFirst itself, as well as through Microsoft's digital software marketplace called "Azure Marketplace."  Azure Marketplace hosts and distributes software products like FaceFirst which use Microsoft's cloud storage software called "Azure."  On the Azure Marketplace, FaceFirst is listed as using "artificial intelligence and machine learning" to "create[] safer communities, more secure transactions […] to help retailers, event venues, transportation centers and other organizations prevent crime and improve customer engagement while growing revenue."[10]  Indeed, according to FaceFirst, their software is uses in-house algorithms which use "neural networks and deep machine learning."[11]

---

[9] https://www.facefirst.com/post/facefirst-welcomes-former-nypd-real-time-crime-center-leader-edwin-coello, (last accessed Aug. 14, 2025).

[10] https://azuremarketplace.microsoft.com/en-us/marketplace/apps/facefirstinc.facefirst?tab=overview, (last accessed Aug. 24, 2025).

[11] https://www.facefirst.com/, (last accessed Aug. 24, 2025).

43.    In the context of facial recognition software like FaceFirst, neural networks and deep machine learning mean that the software continues to improve itself, become more sophisticated and, ultimately, become more valuable as more data is supplied to the software's algorithm. According to PXL Vision, a Swiss company which uses similar facial recognition artificial intelligence which is also powered by neural networks and deep machine learning:

> The most common type of machine learning algorithm used for facial recognition is a deep learning Convolutional Neural Network (CNN).  CNNs are a type of artificial neural network that [is] well-suited for image classification tasks.  CNNs learn to extract figures from images and use those features to classify the images into different categories.[12]

44.    Indeed, as deep learning and neural network powered facial recognition software is supplied more data, it has the ability to improve the software's capacity to tell certain types of facial features apart and make identifications faster.

45.    According to a facial recognition AI engineering expert, Stanislav Kutnyk, there are four ways in which deep learning and use of neural networks enhance the power of software like FaceFirst: (1) knowledge distillation, which allows networks to improve the speed of how quickly it digests data points, (2) transfer learning, which eliminate bottlenecks and misidentifications by improving accuracy, (3) quantization, which speeds up processing by reducing the amount of calculations and memory used to make identifications and (4) adjustments to depthwise separable convolutions, which is the reduction of parameters and calculations to successfully improve performance in facial recognition.[13]

---

[12] https://www.pxl-vision.com/en/glossary/machine-learning, (last accessed Aug. 24, 2025).

[13] Stanislav Kutnyk, "*Improve AI Facial Recognition Accuracy Using Deep Learning,*" MOBIDEV (ONLINE) (Nov. 5, 2024), at https://mobidev.biz/blog/improve-ai-facial-recognition-accuracy-with-machine-deep-learning.

46.     With this in mind, FaceFirst promotes its facial recognition system as delivering a strong return on investment with an average 34% reduction in shrinkage per store.[14]  The company attributes the effectiveness of its software to its widespread use across hundreds of retail chains in North America, and the extensive data it has collected from the world's largest retailers.[15]

### *Civil Rights Concerns About Facial Recognition and FaceFirst*

47.     One of the critical flaws of facial recognition technology is its frequent inaccuracy when applied to racial minorities.

48.     Essentially, "facial recognition automates discrimination," and results in disproportionately harmful consequences impacting communities of color and other protected classes.[16]  Studies reveal "that facial recognition is biased […]  [t]he error rate for light-skinned men is 0.8% compared to 34.7% for darker-skinned women," according to a 2018 study titled "Gender Shades" by Joy Buolamwini and Timnit Gebru [of the] MIT Media Lab.[17]  In 2019, even the Trump administration acknowledged that facial recognition "works best on middle-age white men."[18]

49.     Yet, this has not stopped retailers like Fairway from using this problematic technology. In 2020, Reuters reported that Rite Aid was using FaceFirst's facial recognition in its

---

[14] https://www.facefirst.com/post/how-facefirst-s-face-recognition-offers-retailers-a-dramatic-return-on-investment, (last accessed Aug. 14, 2025).

[15] *Id.*

[16] Rachel Fergus, "*Biased Technology: The Automated Discrimination of Facial Recognition*," ACLU-MINNESOTA (ONLINE) (Feb. 29, 2024), https://www.aclu-mn.org/en/news/biased-technology-automated-discrimination-facial-recognition.

[17] *Id.*

[18] *Id.*

stores located in minority neighborhoods, as part of an aggressive effort to combat retail shrinkage. According to former store managers, the use of FaceFirst was implemented in the "toughest" or "worst" areas of its Rite Aid locations.[19] According to loss prevention staffers who used FaceFirst in Rite Aid stores located in an African American neighborhood in Detroit, Michigan, "[i]t doesn't pick up Black people well.  If your eyes are the same way, or if you're wearing a headband like another person is wearing a headband, you're going to get a [match.]"[20]

50.     In 2016, FaceFirst' software mistakenly targeted a Black man named Tristan Jackson-Stankunas as a shoplifter in a Los Angeles Rite Aid store. Jackson-Stankunas filed a complaint with the California Department of Consumer Affairs arguing that "[Rite Aid] only identified me because I was a person of color.  That's it."[21]

51.     FaceFirst has stated that they "cannot stand for racial injustice of any kind, including in our technology."[22] But despite glaring evidence of disparate impact, FaceFirst has continued to be deployed by Rite Aid in Baltimore, Philadelphia, and Detroit locations – communities with notably higher populations of residents of racial minorities.

### *Fairway's Unlawful Collection of Biometric Information*

52.     Defendant openly collects biometric data of Fairway's Fairway Markets customers from New York City establishments that operate under the business name Fairway Markets, located at:

---

[19] *Id.*

[20] Jeffrey Dastin, "*Rite Aid deployed facial recognition in hundreds of U.S. stores*," REUTERS (ONLINE) (July 28, 2020), at https://www.reuters.com/investigates/special-report/usa-riteaid-software/.

[21] *Id.*

[22] *Id.*

- Fairway Market of 86th Street (240 E. 86th Street)

- Fairway Market of Kips Bay (550 2nd Avenue)

- Fairway Market of Chelsea (766 6th Avenue)

- Fairway Market of 74th Street (2131 Broadway)

53.    Upon information and belief, and based on signage displayed at store entrances, these locations utilize a combination of hardware and software to collect facial recognition templates and scans of customers.  The hardware is likely provided by Fairway, while the software that powers facial recognition collection is reported to be supplied by FaceFirst.[23]

54.    Fairway exchanges facial recognition data for value when it shares biometric information with FaceFirst's loss prevention teams, as well as when it creates consumer profiles from its data set. Fairway and FaceFirst do this pursuant to contract – where both parties profit: Fairway gets the ability to use FaceFirst's software and reaps the benefits of improvements in that software as it provides FaceFirst with more data, while FaceFirst is able to continue to profit from the use of new data to train its artificial intelligence and machine learning as well as to sell more software products attributable to its security successes.

55.    While the stated purpose of the technology is loss prevention and security— purportedly to "stop violence, prevent theft, and create safer stores"[24]—this practice violates New York City's Biometric Identifier Information Law. The law provides a private right of action for violations and does not require prior notice to the consumer in order to pursue a claim for the unlawful sale or sharing of biometric data.

---

[23] Kashmir Hill, *Which Stores Are Scanning Your Face? No One Knows*," New York Times (Online) (March 10, 2023), at https://www.nytimes.com/2023/03/10/technology/facial-recognition-stores.html.

[24] https://www.facefirst.com, (last accessed August 14, 2025).

56.    While the stated purpose is security that purportedly "stops violence, prevent[s] theft and create[s] safer stores," this practice violates New York's Biometric Identifier Information Law section that does not require notice to pursue a private right of action.

## *Tolling, Concealment, and Estoppel*

57.    Defendant's active concealment, and denial of the facts alleged herein toll any statutes of limitation.

58.    Fairway, under contract with FaceFirst, secretly incorporated FaceFirst's facial recognition software into their loss prevention procedures without providing notice that they were collecting the public's biometric data.  Defendant possessed exclusive knowledge of the software's use for purported loss prevention.  Due to non-disclosure agreements, confidentiality clauses in vendor contracts, the highly technical and opaque nature of facial recognition systems, and absence of disclosures by Defendant and FaceFirst, Plaintiff Schottenstein and Class members could never have reasonably uncovered the full scope and consequence of Defendant's conduct. Even with due diligence, it would have been impossible to discover that Defendant was collecting, processing, retaining, selling, or otherwise exploiting facial recognition data for profit.

59.    Additionally, Defendant engaged in fraudulent conduct to prevent Plaintiff Schottenstein and Class members from learning of the conduct as alleged herein. Defendant inconspicuously incorporated FaceFirst's software in the background and did not publicly disclose this technology to its customers. Thus, Plaintiff Schottenstein and Class members had no way of knowing which retail stores they entered were using FaceFirst facial recognition data, let alone how it was retained, used, or shared.  The same logic applies to retailers, like Fairway, which generally do not announce video surveillance in their stores, let alone that they are weaponized

with FaceFirst's software and advanced biometric data collection abilities. And, because this information was obtained and shared by Defendant without adequate consent, the statute of limitations is tolled under the doctrine of fraudulent concealment.

### *Harm to Plaintiff and Class Members*

60. Plaintiff Schottenstein and Class members suffered concrete harm when Defendants collected and converted their facial recognition data for profit. Defendants caused damage and diminution in the value of their biometric data—a form of personal property protected by both inherent and statutory privacy rights.

61. The severity of this violation is heightened by the immutable nature of biometric identifiers; once an individual's facial data is captured and linked to their identity, it cannot be changed or revoked.

### CLASS ALLEGATIONS

62. Pursuant to CPLR Article 9, Plaintiff Schottenstein brings this action on behalf of herself, and all others similarly situated, as representative of following Class (hereinafter defined collectively as the "Class" or "Classes"), defined as follows:

> **CLASS DEFINITION.** All natural persons in the State of New York who had their facial recognition data collected at Defendant's retail stores, including Fairway Markets' grocery stores, using facial recognition software during the applicable statutory period.

63. Excluded from the Class are Defendant and their subsidiaries, affiliates, officers and directors, any entity in which Defendants have a controlling interest, and all judicial officers assigned to hear any aspect of this litigation. Plaintiff reserves her right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

64. *Numerosity.* Millions of putative Class members have entered retail stores outfitted by FaceFirst's facial recognition software and are so numerous that joinder would be impracticable.

65. *Commonality.* Questions of law and fact common to the Class include:

(a) Whether Defendants violated Plaintiff's and Class members' privacy rights;

(b) Whether Defendants violated the NYC Biometrics Law;

(c) Whether Defendants violated Section 5 of the Federal Trade Commission Act;

(d) Whether Defendants violated state consumer protection laws and engaged in unfair practices;

(e) Whether Defendants were unjustly enriched;

(f) Whether Plaintiff and Class members are entitled to equitable relief, including but not limited to injunctive relief, restitution, and disgorgement; and

(g) Whether Plaintiff and the Class members are damages, or other monetary relief.

66. *Typicality.* The claims of Plaintiff and Class members are typical, arising from the same operative facts, and based on the same legal theories. All were harmed by way of the Defendant's uniform conduct as alleged herein. Plaintiff is advancing the claims such that there are no defenses unique to one individual or Class member.

67. *Adequacy of Representation.* Plaintiff will fairly and adequately represent and protect the interests of the Class members; she has no disabling or disqualifying conflicts of interest that would be antagonistic or adverse to those other members of the Class. Plaintiff has retained

counsel experienced in data privacy—particularly biometric privacy—class action litigation. Plaintiff intends to prosecute this action vigorously.

68. *Superiority of Class Action.* A class action is superior to other methods for the fair and efficient resolution of this controversy. The pursuit of numerous individual lawsuits would not be economically feasible for individual Class members. Certification as a class action will preserve judicial resources by allowing common issues to be adjudicated in a single forum, avoiding duplicative hearings or discovery based on identical facts and issues.

69. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members indicate no notable concerns with prosecuting the entirety of the controversy as a class action, where litigation of the claims brought herein would be manageable.

70. It is unlikely that many eligible Class members would be aware of the claims they possess without a class action; meanwhile, adequate notice can be directly given to Class members by using information maintained in the parties' records.

71. *Predominance.* The issues in this action are appropriate for certification because such claims present only particular, common issues—the resolution of which would advance the disposition of this matter and the parties' interests therein.

72. Therefore, class action treatment is the superior method for the fair and efficient adjudication of the controversy and would permit many similarly situated people to prosecute common claims efficiently without unnecessary duplication of effort and expense. The class mechanism offers injured persons meaningful opportunity for redress in cases where pursuing claims individually would be impractical. The advantages of proceeding as a class action substantially outweigh any anticipated challenges that may arise from its management.

## FIRST CAUSE OF ACTION

### VIOLATIONS OF CONSUMER PROTECTION LAW

### NEW YORK GENERAL BUSINESS LAW § 349

73.     Plaintiff realleges and repeats every allegation from paragraphs 1-72 as if fully set forth herein.

74.     New York has a strong public policy of protecting consumers' interests and the privacy of their biometric data.

75.     Additionally, New York's consumer protection statute, New York General Business Law § 349, follows Federal Trade Commission guidance such that violations of Section 5 of the Federal Trade Commission Act also violate New York's New York General Business Law § 349

76.     Defendant Fairway defined as a "business[es]" under New York General Business Law § 349, engaged in "unfair" actions and business practices that were unethical, oppressive, unscrupulous, and substantially injurious to consumers.

77.     Defendant secretly collects and shares biometric data for profit without adequate written consent, bore no corresponding benefit to consumers.  And because Plaintiff and Class members were unaware of the full consequential scope and breadth of Defendant's actions, they could not have avoided the harm it caused.

Case 1:25-cv-08635-LAK    Document 2-1    Filed 10/20/25    Page 25 of 28

78.     Plaintiff and the New York Sub-Class seek all available remedies for Defendant's violation of GBL § 349, including actual damages, restitution, treble damages, statutory damages of $50 per violation, reasonable costs and attorneys' fees, and any other relief the Court deems just and proper.

## SECOND CAUSE OF ACTION

## VIOLATIONS OF NEW YORK CITY'S BIOMETRICS LAW
## LOCAL LAW 2021/003 (*et. seq*)

79.     Plaintiff realleges and repeats every allegation from paragraphs 1-72 as if fully set forth herein.

80.     Under the NYC Biometrics Law, "[i]t shall be unlawful to sell, lease, trade, share in exchange for anything of value or otherwise profit from the transaction of biometric identifier information." *See N.Y. Admin Code § 22-1201.*

81.     Subject to the NYC Biometrics Law, Defendant Fairway's retail stores and businesses violated and continue to violate this statute by selling, leasing, trading, sharing in exchange for value, and otherwise profiting from the transactions containing Plaintiff and the Class' biometric data. Defendant acted willfully and intentionally or, in the alternative, recklessly or negligently.

82.     The privacy interests of Plaintiff and Class Members were harmed, and they are entitled to the relief requested by this Complaint, including statutory damages of up to $5,000 per intentional violation, and $1,000 per reckless violation.

## THIRD CAUSE OF ACTION

## VIOLATIONS OF NEW YORK'S PRIVACY STATUTES

## CIVIL RIGHTS LAW §§ 50-51

83. Plaintiff realleges and repeats every allegation from paragraphs 1-72 as if fully set forth herein.

84. Defendant employs a facial recognition technology system across the State of New York (at Fairway's Fairway Markets locations), that collects, retains, converts, analyzes, stores, and/or shares biometric identifier information of Plaintiff and Class members who entered their retail locations.

85. Defendant uses photographic images obtained through their proprietary facial recognition technology for commercial and trade purposes, including for their own financial gain (by reducing shrinkage and having to hire less loss prevention employees), to enhance the artificial intelligence integrated into co-conspirator FaceFirst's software, and to market FaceFirst as an effective solution for reducing retail shrinkage.

86. However, Plaintiff and members of the Class did not consent to Defendants' use of their images for such purposes. Accordingly, Defendant violated Plaintiff and Class members' right to privacy under N.Y. Civ. Rights Law § 50, which prohibits the unauthorized use of a person's name, portrait, picture, likeness, or voice for advertising or trade purposes without written consent. Under § 51, Plaintiff and members of the Class have a private right of action to seek injunctive relief and recover damages.

## FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT

87. Plaintiff realleges and repeats every allegation from paragraphs 1-72 as if fully set forth herein.

88.     In New York, a Plaintiff has a claim for unjust enrichment where: (i) Defendant profited at the victim's expense, and (ii) it would be against equity and good conscience to permit Defendant to retain what Plaintiffs seek to recover.

89.     Here, Defendant failed to disclose that they collect, retain, convert, store, and share biometric information for profit. Had Plaintiff and other Class members known they were also paying Defendant by providing their own valuable biometric data, they would not have patronized or entered locations outfitted with FaceFirst's technology.

90.     The retail visits to Fairway's Fairway Markets stores enriched Defendant by allowing them to save on security costs at Plaintiff's expense.  Additionally, Plaintiff's and other Class members' visits to these stores enabled FaceFirst to collect valuable biometric data, which it used to train and improve its patented facial recognition software and artificial intelligence while turning significant profit.

91.     Defendant is therefore liable to Plaintiff and members of the Class for the money received from the use of their biometric data. It is against equity and good conscience to permit Defendant to retain the amount under these circumstances, and the value should be disgorged from Defendant and placed into a constructive trust.

## **REQUEST FOR RELIEF**

92.     To remedy these unlawful acts, Plaintiff requests that the Court:

a.     Certify the Classes and appoint Plaintiff as the Class representative;

b.     Find that Defendants' conduct was unlawful, as alleged herein;

c.     Award such injunctive relief and other equitable relief as the Court deems just and proper;

d.  Award Plaintiff and Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution or disgorgement of profits unlawfully obtained;

e.  Award Plaintiff and Class members pre-judgment and post-judgment interest;

f.  Award Plaintiff and Class members reasonable attorneys' fees, costs and expenses; and

g.  Grant such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

93.  Plaintiff demands a trial by jury on all claims so triable.

DATED:  Sept. 16, 2025

Respectfully Submitted,

*/s/ Blake Hunter Yagman*
Blake Hunter Yagman
**SPIRO HARRISON & NELSON LLC**
40 Exchange Place, Suite 1100
New York, New York 10005
Tel.:    202-557-1221
Email:  *byagman@shnlegal.com*

*Attorneys for Plaintiff Schottenstein*
*and the Proposed Classes*